United States Courts
Southern District of Texas
F I L E D

**UNITED STATES DISTRICT COURT**

APR 2 2 2026

**SOUTHERN DISTRICT OF TEXAS**

Nathan Ochsner, Clerk of Court

**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHARLENE HOLMES** | § | |
| **Plaintiff** | § | |
| | § | |
| v. | § | Civil Action No. _4:26cv3281_ |
| | § | |
| **HUNGER FREE AMERICA, INC.** | § | |
| **Defendant.** | § | |

## COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

### I. INTRODUCTION

Plaintiff Charlene Holmes ("Plaintiff"), proceeding pro se, brings this action against Defendant Hunger Free America, Inc. ("Defendant") for disability discrimination, failure to accommodate, failure to engage in the interactive process, and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.

This action arises out of Plaintiff's termination after approximately ten years of employment with Defendant, during which Plaintiff was a founding employee in the program at issue, helped develop the program blueprint with the founding director, trained incoming staff, and developed deep institutional knowledge of the role and its workflow.

Plaintiff was not a marginal employee. Plaintiff helped create the program, understood the role at a foundational level, and regularly trained others to perform it. Plaintiff also trained supervisory personnel. Plaintiff has contact with multiple prior directors, including at least two with whom she remains in contact, who can attest to her competence, performance, reliability, and contributions to the program.

Over time, Plaintiff experienced serious and overlapping medical and mental health conditions, including ADHD, anxiety, depression, complications related to bariatric surgery and bariatric revision surgery, cardiovascular issues, venous insufficiency, and pregnancy-related complications. Instead of meaningfully accommodating Plaintiff's limitations, Defendant treated medically related struggles as performance deficiencies, increased scrutiny, denied internal mobility, and ultimately terminated Plaintiff shortly after Plaintiff formally disclosed her mental health situation to Human Resources and sought help.

The pattern matters. The very performance periods cited by Defendant in the termination letter align with periods in which Plaintiff was pregnant, recovering from major surgery, struggling with significant mental health symptoms, under psychiatric care or trying medication, or otherwise managing serious physical and psychological strain. Plaintiff alleges that Defendant consistently failed to account for these conditions and instead penalized Plaintiff for limitations associated with them.

## II. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the ADA, 42 U.S.C. § 12101 et seq.

Venue is proper in the Southern District of Texas because Plaintiff resides in Richmond, Texas, and performed her work remotely from Richmond, Texas during the relevant period of employment.

## III. PARTIES

Plaintiff Charlene Holmes is an individual residing at 9818 Copper Ranch Trl, Richmond, Texas 77406.

Defendant Hunger Free America, Inc. is a corporation with its principal place of business at 50 Broad Street, Suite 1504, New York, NY 10004, and may be served through its registered agent or by another lawful method of service.

## IV. FACTUAL ALLEGATIONS

Plaintiff began working for Defendant on or about December 1, 2014. Plaintiff was a founding staff member of the program in which she worked.

Plaintiff served as a Program Associate. Her role evolved over time, but her core responsibilities included answering hotline calls and providing resources to families and individuals in crisis, food pantry data validation, communication-related tasks, training

volunteers and new staff, conducting workshops, participating in media interviews, attending team meetings, and collaborating with other departments to improve efficiency.

Plaintiff performed these duties over a long period and was entrusted with meaningful responsibilities. Plaintiff helped develop the blueprint of the program with the founding director and had a level of program knowledge that came from helping create the role itself.

Plaintiff also trained incoming staff on a regular basis. According to Plaintiff, she had even trained the supervisor who later played a role in intensifying performance scrutiny against her. Plaintiff's training responsibilities and foundational role in the program are inconsistent with any suggestion that Plaintiff lacked ability or understanding of the work.

Plaintiff's employment history must be understood in context. Plaintiff has struggled with ADHD since childhood. During the relevant employment years, Plaintiff was also dealing with depression, anxiety, mental health treatment, difficult pregnancies, bariatric surgery complications, cardiovascular and blood pressure issues, venous insufficiency, and related physical and cognitive strain.

Plaintiff alleges that Defendant's cited performance concerns repeatedly arose during the same periods in which Plaintiff was experiencing significant medical events and medical vulnerability.

For example, Defendant's termination letter states that warnings were given on September 11, 2021, September 18, 2021, and October 10, 2021, and that performance issues were also referenced in Plaintiff's 2021, 2022, and 2023 evaluations. Plaintiff gave birth to her daughter on October 27, 2021, only seventeen days after the October 10, 2021 warning cited in the termination letter. Plaintiff alleges that these 2021 concerns occurred while she was pregnant and immediately before childbirth.

In 2022, Plaintiff underwent a revision to a prior bariatric surgery on or about October 25, 2022. Recovery from that surgery required Plaintiff to go without solid meals for weeks. Even before surgery, Plaintiff had been in therapy and was struggling with her mental health. Following the surgery, Plaintiff's depression worsened.

In 2023, Plaintiff was seeing a psychiatrist but discontinued because it was not a good fit and Plaintiff did not appear to be doing well on the medication. During that same year, Plaintiff experienced a surprise pregnancy. The pregnancy was especially complicated because the child was conceived while Plaintiff had an IUD, Plaintiff experienced placenta previa, and Plaintiff was also a post-operative bariatric patient with limited

ability to eat enough to sustain the pregnancy comfortably. Despite this, Plaintiff continued to work.

Plaintiff gave birth to her son early in 2024, on or about February 19, 2024. Plaintiff alleges that Defendant continued to characterize Plaintiff's performance as inconsistent during this period despite the serious physical and mental strain Plaintiff was experiencing.

Plaintiff had direct verbal conversations with her supervisor as early as approximately 2019 regarding her mental health and management approach. Plaintiff repeatedly pleaded with her supervisor to take a different approach because micromanagement further triggered Plaintiff's anxiety and ADHD rather than helping her perform better.

Plaintiff also disclosed in her 2023 employee evaluation that she had challenging days due to ADHD and her pregnancy, that those conditions could slow her down and affect focus and productivity, and that she had only recently started sharing the diagnosis. In that same evaluation, Plaintiff explained that friendly reminders helped her stay on task and that certain communication and management approaches were more helpful than others.

Thus, by no later than Plaintiff's 2023 evaluation, Defendant had written notice from Plaintiff herself that ADHD and pregnancy were affecting focus and productivity.

In or around October or November 2024, during open enrollment season, Plaintiff had a more formal discussion with Human Resources, including Julie and Becca. Plaintiff explained the immense pressure she was under due to the way her manager was micromanaging her performance and that the work environment no longer felt psychologically safe.

Human Resources asked Plaintiff to obtain documentation and think about what kind of accommodation she would need. Plaintiff did not yet know what accommodation would be most appropriate because Plaintiff had not established care with a psychiatrist who could assess her needs and advise on a suitable accommodation. Plaintiff had only recently obtained insurance and was attempting to locate a provider who accepted that insurance.

Plaintiff was therefore actively trying to engage in the accommodation process in good faith. Plaintiff alleges that instead of following through on that process, Defendant moved toward termination before Plaintiff could obtain appropriate medical guidance and documentation.

Plaintiff does not recall Defendant meaningfully engaging in a good-faith interactive process after that Human Resources disclosure. Plaintiff does not want to speculate beyond what

she knows and therefore alleges only that she does not recall meaningful follow-up and that she was terminated shortly thereafter.

Rather than reducing pressure, Defendant increased scrutiny. Plaintiff's supervisor closely logged Plaintiff's activities, including when Plaintiff took lunch, how long Plaintiff took on calls, and when Plaintiff entered call log reports.

Plaintiff alleges that expectations were inconsistent and shifting. On one day Plaintiff could be told that a call log could be submitted by the following morning, and then direction would change and Plaintiff would still be held accountable for not inputting it in real time. Plaintiff alleges that this created an environment in which she could not reliably satisfy expectations because the rules themselves shifted while accountability remained rigid.

Plaintiff also had to complete surveys associated with the work. Plaintiff at times completed survey-related work off the clock because she needed a quiet environment in order to focus and do the work accurately. Plaintiff alleges that any argument that she was occasionally permitted to step off the hotline to enter surveys misses the point because such relief was inconsistent and informal, and Plaintiff was still held to comparative time expectations based on how fast her supervisor or coworkers performed the same tasks.

Plaintiff was repeatedly compared to coworkers or to her supervisor on the basis of speed and timing. Plaintiff alleges that these comparisons failed to account for her disclosed conditions and failed to account for the fact that Plaintiff did not know whether those coworkers had comparable medical limitations or neurodivergent conditions. The result was that Plaintiff felt that no matter how hard she tried, it was never sufficient.

Plaintiff requested the opportunity to move into another department that would better align with her strengths. Plaintiff's supervisor said she could not help Plaintiff move because of Plaintiff's allegedly inconsistent performance. Yet, instead of reducing pressure or moving Plaintiff into a more suitable role, the supervisor assigned Plaintiff additional tasks outside of her regular role, allegedly so that Plaintiff could prove she could handle additional work.

Plaintiff alleges this was contradictory and strange. On the one hand, Plaintiff was told she could not move to another department because of performance concerns. On the other hand, Plaintiff was given additional responsibilities outside her role to prove her capability, despite the fact that Plaintiff had helped create the program, knew the role deeply, had trained the supervisor, and was regularly training new staff. Plaintiff alleges

this contradiction undermines Defendant's stated justification and supports a finding that the performance rationale was pretextual.

Plaintiff's supervisor also stated that she could not provide Plaintiff with a favorable reference in good conscience because of Plaintiff's performance. As a result, Plaintiff felt stuck. The job she had held the longest was the very job from which she could not obtain support for internal mobility or an external reference, effectively trapping Plaintiff in the role while simultaneously intensifying scrutiny within it.

Plaintiff alleges that Defendant denied her a meaningful path to succeed: Plaintiff was not appropriately accommodated, was not moved into a role better suited to her strengths, was held to shifting and comparative expectations, and was then penalized when those circumstances affected timing and workflow.

On December 11, 2024, Plaintiff was called into a meeting with Human Resources and terminated effective immediately. Plaintiff states that by that time the period had become so tense that she knew she was going to be fired. Plaintiff describes feeling numb and feeling as though she should never have shared her diagnosis.

The termination letter states that Plaintiff was terminated due to inability to complete work in a timely manner and failure to communicate issues that arise. The letter further states that warnings had previously been communicated on September 11, September 18, and October 10, and that issues regarding timely completion of work were also reported on the 2021, 2022, and 2023 performance reviews.

Plaintiff alleges that Defendant's stated performance concerns directly correspond with periods in which Plaintiff was pregnant, recovering from major surgery, suffering significant mental health symptoms, under psychiatric treatment or medication changes, or otherwise dealing with overlapping medical hardship. Plaintiff further alleges that Defendant consistently treated those medically related limitations as performance failures rather than engaging in accommodation.

Plaintiff alleges that being fired after the formal disclosure to Human Resources in late 2024, after years of verbal disclosures and pleas for a different management approach, felt targeted and oddly coincidental. Plaintiff contends the timing is not coincidence but part of a pattern culminating in termination shortly after formal protected activity.

At the time of termination, Plaintiff earned approximately $27.32 per hour, worked approximately 35 hours per week, and was paid biweekly. Plaintiff's pay records reflect gross pay around the time of separation consistent with those rates and hours.

Since termination, Plaintiff has remained unemployed. Plaintiff has not been able to secure replacement employment and returned to school while continuing to look for remote work compatible with caregiving responsibilities.

Plaintiff is the mother of three children. Her oldest child is preparing for college. Plaintiff also has two younger children on the autism spectrum who require significant care, therapies, and support. Plaintiff alleges that Defendant's actions have had devastating consequences not only for Plaintiff, but for the stability of her household and children.

Plaintiff and her family are now living with serious financial hardship. Plaintiff alleges that she is at risk of losing her home. The household has had to rely on public assistance, including approximately $112 per month in food stamps, while Plaintiff's husband's income is only sufficient to cover utilities. Plaintiff alleges that available resources are insufficient to meet basic living expenses, educational expenses, caregiving needs, food, healthcare, transportation, and household stability.

Plaintiff also alleges severe emotional harm. Plaintiff states that she has been in a constant state of survival mode, that the possibility of being unable to support her oldest child beyond what financial aid covers is anxiety-triggering, and that she has needed medication to manage the mental overload of juggling unemployment, financial hardship, caregiving responsibilities, depression, and the aftermath of Defendant's conduct.

The impact on Plaintiff's family is substantial. Plaintiff alleges reduced financial and emotional capacity in the household, instability for her children, and strain on the household's ability to meet the needs of two disabled younger children and a college-bound oldest child.

## V. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

The EEOC issued a Notice of Right to Sue dated January 22, 2026, on Charge No. 460-2025-08715.

Plaintiff brings this action within ninety (90) days of receipt of that Notice.

## VI. CLAIMS FOR RELIEF

## COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Plaintiff is a qualified individual with a disability within the meaning of the ADA.

Plaintiff could perform the essential functions of her position, with or without reasonable accommodation. Plaintiff's long tenure, foundational role in program design, training duties, and support from prior directors all demonstrate Plaintiff's competence and qualification.

Defendant knew or had reason to know of Plaintiff's disabilities and limitations through verbal disclosures, Plaintiff's 2023 evaluation comments, direct discussions with Plaintiff, and Plaintiff's late-2024 Human Resources disclosure.

In 2024, shortly before her termination, Plaintiff was placed on a performance-related probationary period by her supervisor. Plaintiff was informed that this period would extend through approximately December 15, 2024, and was intended to provide Plaintiff with an opportunity to improve her performance. However, on December 11, 2024 prior to the conclusion of that probationary period Plaintiff was terminated. Plaintiff alleges that Defendant's decision to terminate her before the completion of the stated improvement period demonstrates that Defendant did not intend to provide a meaningful opportunity for improvement and had already predetermined the outcome.

Defendant subjected Plaintiff to adverse employment actions, including heightened scrutiny, comparative and inconsistent performance enforcement, denial of internal movement to another department, denial of support, and termination.

Plaintiff alleges these adverse actions were taken because of disability and disability-related limitations, and because Defendant chose to treat medically related struggles as performance failures.

**COUNT II – FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA**

Plaintiff's ADHD, anxiety, and depression substantially limit one or more major life activities, including concentration, focus, and cognitive processing, and therefore qualify as disabilities under the ADA.

Plaintiff attempted in good faith to pursue medical guidance and documentation but had only recently obtained insurance and was still locating an appropriate provider.

Reasonable accommodation could have included, among other things, meaningful modification of performance-management methods, consistent timing expectations, effective administrative support, more realistic workflow expectations, or transfer to another department better aligned with Plaintiff's strengths.

Defendant failed to provide reasonable accommodation and instead maintained or increased pressure while Plaintiff was attempting to engage in the process.

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Once Plaintiff disclosed disability-related limitations and Human Resources requested documentation and discussed accommodations, Defendant had a duty to engage in a timely, good-faith interactive process aimed at identifying an effective accommodation.

Defendant failed to engage in that process in good faith, failed to meaningfully follow through, and terminated Plaintiff before the process could be completed.

## COUNT III – RETALIATION IN VIOLATION OF THE ADA

Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

Plaintiff engaged in protected activity under the ADA by disclosing her disabilities, including ADHD, anxiety, and depression; requesting support and a different management approach; communicating that the work environment no longer felt psychologically safe; seeking reasonable accommodation; and participating in discussions with Human Resources regarding her medical conditions and need for workplace adjustments.

Defendant was aware of Plaintiff's protected activity through Plaintiff's direct communications with her supervisor, her written disclosures in her 2023 employee evaluation, and her formal discussions with Human Resources in or around October and November 2024.

Following Plaintiff's protected activity, Defendant subjected Plaintiff to adverse employment actions, including increased scrutiny, heightened monitoring of her work activities, inconsistent and shifting performance expectations, continued comparative performance pressure, denial of internal transfer opportunities, and ultimately termination of her employment.

Plaintiff was terminated on or about December 11, 2024, shortly after her formal disclosure to Human Resources and her efforts to engage in the accommodation process.

The temporal proximity between Plaintiff's protected activity and her termination supports a causal connection between the two.

The sequence of events, including Plaintiff's disclosure, Defendant's escalation of scrutiny, and Plaintiff's termination shortly thereafter, supports an inference that Defendant's actions were retaliatory.

Defendant's stated reasons for termination, including alleged performance deficiencies, are pretextual. Plaintiff alleges that these justifications are not credible in light of her long tenure, foundational role in the program, history of training staff and supervisors, and the timing of Defendant's actions following her protected activity.

As a direct and proximate result of Defendant's retaliatory conduct, Plaintiff has suffered and continues to suffer damages, including lost wages, loss of employment, emotional distress, mental anguish, and other damages as set forth more fully herein.

## VII. DAMAGES

As a direct and proximate result of Defendant's actions, Plaintiff has suffered lost wages, lost benefits, loss of employment, and continued unemployment.

Plaintiff has suffered severe financial hardship, including risk of losing her home, inability to meet basic household needs, and forced reliance on public assistance.

Plaintiff has suffered emotional distress, mental anguish, anxiety, depression, humiliation, and psychological strain, including a constant state of survival mode and the need for medication to manage the resulting mental overload.

Plaintiff has suffered damage to her professional reputation and future employability, including being denied a favorable reference from the employer she served for the longest period of her career.

Plaintiff's family has also suffered material hardship and instability because of the loss of Plaintiff's income and the resulting strain on the household's ability to support three children, including two disabled younger children who require substantial care and a child preparing for college.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and award the following relief:

a. Back pay, front pay, lost wages, and lost benefits;

b. Compensatory damages for emotional distress, mental anguish, humiliation, and related harm;

c. Punitive damages as permitted by law;

d. Costs of court and any other relief to which Plaintiff may be entitled;

e. Pre-judgment and post-judgment interest as allowed by law;

f. Such other and further relief as the Court deems just and proper; and

g. Injunctive relief requiring Defendant to implement policies, practices, and training to ensure compliance with the Americans with Disabilities Act, including training related to accommodating employees with non-visible disabilities such as neurodivergent conditions.

## IX. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Respectfully submitted,


Charlene Holmes

9818 Copper Ranch Trl

Richmond, TX 77406

(281) 505-4080

ccaceresholmes@gmail.com



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

Houston District Office
1919 Smith Street, 6th Floor
Houston, TX 77002
(346) 327-7700
Website: www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 01/22/2026

**To:** Ms. Charlene Holmes
9818 Copper Ranch Trl
RICHMOND, TX 77406
Charge No: 460-2025-08715

EEOC Representative and email:   ARTURO MEDINA
INVESTIGATOR
ARTURO.MEDINA@EEOC.GOV

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 460-2025-08715.

On behalf of the Commission,

Digitally Signed By:Rayford O. Irvin
01/22/2026
_____
Rayford O. Irvin
District Director

Cc:
Hunger Free America
9818 Copper Ranch Trl
RICHMOND, TX 77406


Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 460-2025-08715 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 460-2025-08715 to the District Director at Rayford O. Irvin, 1919 Smith Street 6th Floor, Houston, TX 77002.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### Notice Of Rights Under The ADA Amendments Act Of 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.

- ✓ **Only one** major life activity need be substantially limited.

- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

Enclosure with EEOC Notice of Closure and Rights (05/25)

**are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

### "Regarded as" coverage

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.*